1997 OK 155

**FIRST AMERICAN BANK AND TRUST COMPANY OF PURCELL, Oklahoma, a banking corporation, Plaintiff,**

v.

**OKLAHOMA INDUSTRIAL FINANCE AUTHORITY, Appellee/Defendant,**

and

**County Treasurer of Oklahoma County and Board of County Commissioners of Oklahoma County, Appellants/Defendants,**

and

**B & B Wholesale Meat Company, Inc., an Oklahoma corporation; United States of America; Chrysler Capital Corporation, f/k/a E.F. Hutton Credit Corporation; Cash Flow Management, Inc., Defendants.**

**The OKLAHOMA INDUSTRIAL FINANCE AUTHORITY, Third Party Plaintiff,**

v.

**Larry BEASLER, an individual; and Louise Beasler, an individual, Third Party Defendants.**

No. 87070.

Supreme Court of Oklahoma.

Dec. 23, 1997.

As Corrected April 3, 1998.

State agency, acquired the property. In place of a sale of the property, the Legislature intended 68 O.S.1991, § 2940 to act as the mechanism to insure that all valid *ad valorem* real estate taxes previously assessed or that would become due prior to OIFA's acquisition of the property are paid. Normally, § 2940 provides such taxes should be paid by deducting them from the purchase price paid to the private seller for remittance to the County—which was not done in this case. In that taxes required to be paid to County under § 2940 when OIFA purchased the property have not been paid and the Legislature intended § 2940 to be the substitute remedy to sale of the property for collection of the taxes, the appellants, Oklahoma County Treasurer and Board of Commissioners (County) may sue OIFA in a civil action to recover the taxes if they are not paid.

### PART I. STANDARD OF REVIEW.

¶2 The trial court granted summary judgment in favor of OIFA and against County. Thus, the standard for appellate review is that applied to a trial court's grant of summary judgment which was set out in *Carmichael v. Beller*, 1996 OK 48, 914 P.2d 1051, as follows:

> Although a trial court in making a decision on whether summary judgment is appropriate considers factual matters, the ultimate decision turns on purely legal determinations, i.e. whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions. Therefore, as the decision involves purely legal determinations, the appellate standard of review of a trial court's grant of summary judgment is *de novo*. [This Court], like the trial court, will examine the pleadings and evidentiary materials submitted by the parties to determine if there is a genuine issue of material fact. Further, all inferences and conclusions to be drawn from the evidentiary materials must be viewed in the light most favorable to the non-moving party. (citations omitted)

*Id.* at 1053.

### PART II. FACTS AND PROCEDURAL BACKGROUND.

¶3 OIFA has authority to make loans and secure them by mortgages. The autho-

W.A. Drew Edmondson, Attorney General, and John Crittenden, Assistant Attorney General, Oklahoma City, for Appellee.

Gretchen Crawford, Assistant District Attorney, Oklahoma City, for Appellants.

LAVENDER, Justice.

¶1 We hold the tax exemption afforded State-owned property found in OKLA. CONST. art. 10, § 6 did not have the effect of extinguishing all Oklahoma County *ad valorem* real estate taxes assessed and owing against certain property when appellee, Oklahoma Industrial Finance Authority (OIFA), a

rization emanates from OKLA. CONST. art. 10, § 33A and is vitalized through the Oklahoma Industrial Finance Authority Act, 74 O.S.1991, § 851 et seq., as amended. OIFA's purpose is to aid and assist Oklahoma's industrial development and provide additional employment and payrolls in the State. 74 O.S.1991, § 852. OIFA is authorized to take title by foreclosure to any industrial development project where the acquisition is necessary to protect a loan made by it and may sell, transfer and convey any such project to a responsible buyer. 74 O.S.1991, § 855(o). Further, to minimize financial losses and sustain employment, if sale, transfer or conveyance cannot be accomplished with reasonable promptness, OIFA may lease a project acquired through foreclosure to a responsible tenant or tenants. *Id.*

¶ 4   In 1988 B & B Wholesale Meat Company, Inc. (B & B) was loaned $525,000.00 from OIFA and $75,000.00 from First American Bank and Trust Company of Purcell (bank). Partly securing the loans was a parity real estate mortgage in which OIFA had an interest of 87.5% and bank, 12.5%.[1] B & B defaulted on the loans and bank brought a foreclosure suit, in which OIFA and County were made defendants. OIFA cross-claimed against B & B seeking foreclosure and against County, claiming the superiority of its lien. By a counter/cross-claim, County asserted a superior lien on the property by virtue of delinquent *ad valorem* real estate taxes for the years 1985 through 1990, as well as liens which might attach during the pendency of the foreclosure suit.[2] In reply to County's counterclaim, bank admitted County's *ad valorem* real estate tax liens were superior to its mortgage lien.

¶ 5   OIFA and bank moved for summary judgment. In August 1991 the trial court entered a partial judgment deciding B & B had defaulted on the loans, the amounts owed to OIFA and bank by B & B were determined, and the property was ordered sold.[3] The judgment reserved for future consideration County's claim for taxes. A sheriff's sale was held, which was confirmed by the trial court in February 1992. The purchasers at the sheriff's sale were OIFA and bank who bought the property for $35,000.00. A sheriff's deed was issued to OIFA and bank as tenants in common in their parity mortgage percentages—i.e. undivided interests of 87.5% and 12.5%, respectively. The sheriff's sale proceeds were insufficient to satisfy OIFA's mortgage lien against the property. A $35,000.00 credit was given against OIFA's and bank's earlier judgment.

¶ 6   Before the trial court finally decided all issues concerning County's tax lien(s) or claim for past-due taxes, in August 1995 bank sold its interest to OIFA by quitclaim deed reflecting OIFA paid bank $1,000.00. OIFA then moved for summary judgment *in rem*, essentially asserting that upon its acquisition, the property became tax exempt and any County *ad valorem* real estate tax lien existing against the property was extinguished. Although recognizing it could not sell State-owned property to recover past-due real estate taxes arising while the property was previously privately owned, County cross-moved for summary judgment asserting § 2940 gave it an *in personam* cause of action against OIFA for a money judgment for all delinquent real estate taxes through August 1995. At the time of filing its cross-motion for summary judgment County submitted an affidavit from a Deputy Treasurer

1.   In actuality, the record indicates OIFA made an industrial development loan to the Oklahoma County Finance Authority (OCFA), who in turn loaned the money to B & B and that OCFA was the original mortgagee, along with bank, in the mortgage. The OCFA's note and its share in the mortgage were assigned to OIFA. The record also indicates security interests were taken in B & B personal property and certain personal guarantees were obtained to secure repayment. Finally, the record shows bank had other financial dealings with B & B and/or its principals, which are not relevant to our decision.

2.   County also claimed a lien on the property by virtue of certain unpaid personal business taxes. No issue concerning such taxes is before us in this appeal.

3.   The August 1991 partial judgment, as it relates to B & B, was only an *in rem* judgment in regard to the subject property for the amounts due from B & B on the involved notes. No personal judgment against B & B was issued, apparently because B & B had filed for bankruptcy and the automatic stay of the bankruptcy laws had only been lifted as it pertained to the subject property.

for Oklahoma County that $12,613.57 in delinquent taxes, penalties and interest was due and owing for *ad valorem* real estate taxes. The affidavit also reflects that despite the tax delinquency, the property was never sold in a tax certificate sale or a tax resale.

¶ 7  The trial judge granted judgment *in rem* to OIFA. He held the property became tax exempt when OIFA acquired it and all County *ad valorem* real estate taxes assessed and owing against the property while privately owned were extinguished. He also found § 2940 was inapplicable and prohibited County from attempting to collect the taxes from OIFA, its successors or assigns.

¶ 8  County appealed and the Court of Civil Appeals (COCA), disagreeing with part of the trial judge's decision, reversed and remanded for further proceedings. County sought certiorari which we previously granted. We now vacate the COCA memorandum opinion, reverse the trial court judgment and remand for further proceedings consistent with this opinion.

**PART III. OKLA. CONST. ART. 10, § 6 DID NOT EXTINGUISH VALID OKLAHOMA COUNTY *AD VALOREM* REAL ESTATE TAXES EITHER PREVIOUSLY ASSESSED OR THAT WOULD HAVE BECOME DUE FOR THE PERIOD THE PROPERTY WAS PRIVATELY OWNED PRIOR TO OIFA'S ACQUISITION.**

¶ 9  We first note it is unnecessary to decide in this case whether OKLA. CONST. art. 10, § 6 would in all situations preclude sale of State-owned property as a collection mechanism for the recovery of *ad valorem* real estate taxes delinquent at the time of State acquisition. Nor must we decide the current status of County's claimed lien(s) on the real property involved in this case. Two reasons counsel against the necessity for decisions on these matters. One, County essentially concedes it may not sell the involved property as a method to recover the taxes claimed to be due. Two, as we will set out in Part IV, *infra*, it is our view, the Legislature intended 68 O.S.1991, § 2940 to act as the substitute remedy—to sale of the property—for collection of validly owing *ad valorem* real estate taxes arising while the property is in private ownership, but remain unpaid at the time of State acquisition. With these matters understood, we turn to our review of the trial court's judgment.

¶ 10  In interpreting an Oklahoma constitutional provision our goal is to give effect to the intent of its framers and the people adopting it. *Draper v. State*, 1980 OK 117, 621 P.2d 1142, 1145. To determine this intent we look to the instrument itself and when the text of a constitutional provision is unambiguous, the courts, in construing it, are not at liberty to search for meaning beyond the instrument. *Id.* at 1145–1146. The tax exemption for State-owned property found in OKLA. CONST. art. 10, § 6 provides in pertinent part as follows: "[A]ll property of this state, and of counties and of municipalities of this state ... shall be exempt from taxation...."[4]

¶ 11  The unambiguous language of § 6 concerns itself only with granting a tax exemption to property of the State once the property is acquired by the State—i.e. the provision is plainly prospective in nature and does not purport to reach the issue of how to handle previously assessed taxes or those that may be due for the period of time the property remained in private ownership prior to the State's acquisition.[5] Confusion has arisen on this point, however, mainly beginning with this Court's decision in *State ex rel. Commissioners of Land Office v. Galyon*, 154 Okla. 204, 7 P.2d 484 (1932).

4.  Although OKLA. CONST. art. 10, § 6, has undergone amendment in certain particulars over the years, the express tax exemption for property of the State has existed since the Statehood era. *See* OKLA. CONST. art. 10, § 6, REV. LAWS OKLA. ANN. (1910). The language quoted in the text currently appears in subsection (a) of art. 10, § 6 of the Oklahoma Constitution. OKLA. CONST. art. 10, § 6 was most recently amended in a way not germane to this proceeding in 1992.

5.  As to the tax exemption once the property is owned by the State, county or municipality, this Court has recognized the exemption is unconditional and without limitation, and applies without reference to the use the property may be put. *State ex rel. City of Tulsa v. Mayes*, 174 Okla. 286, 51 P.2d 266 (1935).

¶ 12 In *Galyon,* this Court held that real estate acquired by the State in its sovereign capacity is thereupon absolved and freed of further liability for the taxes previously assessed against it while in private ownership and a county treasurer is thereafter without legal authority to sell the property for such past-due taxes. 7 P.2d at 484, *Syllabus One.* Part of the rationale contained in *Galyon* for this proposition appeared to be the tax exemption afforded State-owned property contained in OKLA. CONST. art. 10, § 6.

¶ 13 The situation in *Galyon* was that the Commissioners of the Land Office had loaned a private land owner money from the school land trust fund and secured the loan with a mortgage. 7 P.2d at 485. The mortgage was foreclosed and the Commissioners purchased the land at sheriff's sale. *Id.* The Commissioners then sued to permanently enjoin a county treasurer from advertising for sale and selling the involved property for delinquent taxes arising while it was still in private ownership. *Id.* This Court ruled the Commissioners were entitled to a permanent injunction as requested. *Id.* at 486.

¶ 14 The Commissioners of the Land Office, a constitutionally established State agency, have charge of the sale, rental, disposal and management of the school lands and other public lands of the State, and of the funds and proceeds derived therefrom, under rules and regulations prescribed by the Legislature. OKLA. CONST. art. 6, § 32. As part of this charge, the Commissioners are given the responsibility for the investment of the permanent common school and other educational funds. OKLA. CONST. art. 11, § 6(B) (1997 O.S.Supp). Strict constitutionally based restrictions are placed on the use of these funds. The restrictions include: that the income from the permanent school fund shall be used for the maintenance of the State's common schools, that the principal shall be deemed a trust fund that shall forever remain inviolate and that the fund shall never be diminished. OKLA. CONST. art. 11, § 2. Further, no portion of the permanent school fund may be diverted for any other use or purpose. *Id.*[6] This Court has also recognized the State has an irrevocable duty, as Trustee, to manage the trust estate for the exclusive benefit of the beneficiaries and return full value from the use and disposition of the trust property. *Oklahoma Education Association, Inc. v. Nigh,* 1982 OK 22, 642 P.2d 230, 235–236.

¶ 15 In our view, *Galyon* should be read as a recognition that allowing the sale of lands acquired by the Commissioners in the course of their constitutional duties to pay for previously assessed taxes, would be inconsistent with the protection afforded school land trust funds in the above-referenced constitutional provisions.[7] *Galyon* cannot, however, be taken to mean that the tax exemption afforded State-owned property found in OKLA. CONST. art. 10, § 6 automatically cancels all outstanding *ad valorem* real estate taxes validly assessed prior to acquisition by a State agency like OIFA, as the trial court appears to have ruled. Nor may *Galyon* be read to mean the Legislature is prohibited by the force of § 6 from mandating that such previously assessed taxes are required to be paid when a State agency like OIFA acquires real property, as it has done in this case.

■ ¶ 16 Generally, the Legislature has authority to require payment of taxes assessed against real estate while privately owned, but which remain unpaid when the State acquires the property for some legitimate governmental purpose. This legislative authority was expressly recognized in *Board of Commissioners of Marshall County v. Shaw,* 199 Okla. 66, 182 P.2d 507 (1947) where this Court upheld, over various Oklahoma constitutional challenges, a law pro-

---

6. OKLA. CONST. art. 11, § 5 contains similar restrictions on certain other funds constitutionally designated for use by certain educational institutions of the State.

7. In fact, in order to safeguard the school land trust funds, the Legislature itself passed a statute in 1935 providing for the cancellation of previously assessed taxes on land acquired by the Commissioners of the Land Office. 1935 Okla. Sess.Laws, p. 116–117, § 29; See now 64 O.S. 1991, § 151. In *State ex rel. Commissioners of Land Office v. Passmore,* 189 Okla. 232, 115 P.2d 120, 121–122 (1941) this Court recognized § 151 was passed to safeguard the school land trust funds.

mulgated by the Oklahoma Legislature that reimbursed two counties for taxes lost by virtue of the establishment and liquidation of a State prison farm. The taxes reimbursed included those which were assessed while the property was privately owned, but which remained unpaid at the time the State initially acquired the real estate. *Id.* at 509.

¶ 17 The trial court, therefore, erred in granting OIFA a judgment to the effect that when OIFA acquired the property all County *ad valorem* real estate taxes assessed and owing against the property while privately owned were extinguished.

**PART IV. 68 O.S.1991, § 2940 IS PLAINLY APPLICABLE TO OIFA'S ACQUISITION OF THIS PROPERTY AND REQUIRES PAYMENT OF *AD VALOREM* REAL ESTATE TAXES EITHER PREVIOUSLY ASSESSED OR THAT WOULD HAVE BECOME DUE FOR THE PERIOD THE PROPERTY WAS PRIVATELY OWNED PRIOR TO OIFA'S ACQUISITION.**

¶ 18 Although recognizing delinquent taxes arising while the property was previously in private ownership cannot now be collected in the normal manner by sale of the real estate because it is owned by the State, County asserts the Legislature granted it an *in personam* action against the State (here represented by OIFA—a State agency) in § 2940 to recover a money judgment for the past-due taxes. The trial court determined § 2940 was inapplicable. We disagree. Section 2940 provides:

Whenever the United States, the state, or a city, town, county, school district, or any other political subdivision, including, but not limited to, a turnpike authority, municipal trust, water or conservation district, flood control district, levee or waterway improvement district, urban renewal authority, public housing authority, or any other authority authorized by law, state or federal, acquires title to any real property for a governmental purpose between January 1 and October 1 of the tax year, such property shall be relieved of ad valorem tax for the remaining months of the year beginning with the first of the month next succeeding the date its acquisition for public purposes becomes a matter of public record, if the deed thereto was recorded prior to October 1; provided, however, that all taxes assessed against such property prior to its acquisition shall be paid in full and there be paid a sum equal to one-twelfth (1/12) times the number of months that the property remained in private ownership of an amount estimated by the county treasurer of the county wherein the real property lies to be substantially equal to the amount of tax which would have been or will become due and payable for the year had the real property not been acquired for public purposes. In estimating the amount of taxes which would have been or will become due and payable for the tax year had the real property not been acquired for public purposes the county treasurer shall use as a basis the current assessment and the tax rate for the preceding year, unless the tax for the current year shall be by then determined and set, in which event he shall use as basis the new assessment and rate. The public agency acquiring the property shall deduct the amount of such taxes from the purchase price payable to the private owner and remit the same to the county treasurer in satisfaction of such taxes. The county treasurer of any county is hereby authorized upon order of the board of tax roll corrections to cancel of record all taxes assessed against such property for the year of its acquisition when the deed thereto was recorded prior to October 1 and the aforesaid estimated amount of the tax for the months that the property was in private ownership is paid, which order shall be issued upon application of the acquiring authority.

¶ 19 Of course, the fundamental rule of statutory construction is to ascertain and give effect to legislative intent. We are also guided by 25 O.S.1991, § 1 which generally requires that words used in a statute are to be understood in their ordinary sense unless a contrary intention plainly appears. Further, where the Legislature has clearly expressed its intent, the use of additional rules of construction are unnecessary and a statute

will be applied as written. *Fuller v. Odom,* 1987 OK 64, 741 P.2d 449, 452–453.

¶ 20  The plain language of § 2940 provides, upon acquisition by the State for a governmental purpose, the real estate shall be relieved of **future** *ad valorem* taxation. However, the statute also unequivocally expresses legislative intent that taxes assessed prior to a covered acquisition "shall be paid in full" and essentially that a proportional share of the current (i.e. acquisition) year taxes that would have been or will become due for the period of time the property remained in private ownership prior to the governmental agency's acquisition, shall also be paid.  The statute further provides that the public agency acquiring the property shall deduct the taxes mandated to be paid from the purchase price payable to the private owner and remit them to the county treasurer.  As far as this record shows, no taxes were deducted or remitted to the County when OIFA purchased the property, partly at sheriff's sale and partly from the bank.

¶ 21  As we read § 2940, the involved acquisition by OIFA was unmistakably intended by the Legislature to fall within the statute's ambit because OIFA's acquisition was clearly one by a State instrumentality for a governmental or public purpose. OIFA is defined as a body corporate and politic, constituting a public corporation and governmental instrumentality of the State of Oklahoma.  74 O.S.1991, § 854(A).  It is expressly empowered, in the sphere in which it acts, to exercise public powers of the State.  74 O.S.1991, § 855.  Further, there can be no doubt that in acquiring the real estate involved in this case, OIFA was acquiring it for a governmental or public purpose, to wit: carrying out its mandate to aid and assist Oklahoma's industrial development.  *See Burkhardt v. City of Enid,* 1989 OK 45, 771 P.2d 608 (economic development is a legitimate public purpose within the meaning of OKLA. CONST. art. 10, § 14 which restricts the use of public funds

to expenditures for a public purpose).  The Legislature itself has recognized that OIFA's loan of funds for industrial development is geared toward a public purpose. 74 O.S.1991, § 859.  Clearly then, contrary to the trial court's determination of inapplicability, § 2940 plainly applies to OIFA's acquisition of the involved property.

¶ 22  Normally, when taxes due and owing on real property are not paid in a timely manner and become delinquent, the provisions of the Ad Valorem Tax Code, 68 O.S. 1991, § 2801 et seq., as amended, provide a detailed statutory scheme for their recovery. If the taxes are not paid, implementation of the Tax Code requires public offering of the property for sale to recoup the taxes.  68 O.S.1991, § 3101 et seq., as amended.  Under the Tax Code, one of the potential ultimate outcomes of the collection mechanisms for delinquent taxes is divestment of an owner's right, title and interest in the land, and a vesting in a resale tax deed purchaser an absolute and perfect title in fee simple to the real estate.  *Dunlap v. Mayer,* 1959 OK 125, 341 P.2d 258 *Syllabus by the Court;* 68 O.S.Supp.1997, § 3131(a).

¶ 23  In our opinion, § 2940 was plainly intended by the Legislature to act as the substitute mechanism for enforcement of the payment of due and owing *ad valorem* taxes in the situation where the State, through one of its agencies, acquires property for a governmental purpose upon which previously assessed taxes are unpaid or that would become due prior to the State's acquisition.  In other words, the obvious intent of § 2940 was that it act as a substitute remedy for the normal method of collection of *ad valorem* taxes contained in the Ad Valorem Tax Code, a method which ultimately could lead to divestment of the property owner's title to the real property.  Accordingly, in that taxes required to be paid to County under § 2940 when OIFA purchased the property have not been paid, County may sue OIFA in a civil action to recover them if they are not paid [8]

---

8.  We note the Legislature has authorized OIFA to sue and be sued in all courts.  74 O.S.1991,

§ 855(h).

and the trial court erred in enjoining County from attempting to collect such taxes from OIFA.[9]

## PART V. CONCLUSION.

¶ 24 The trial court erred in granting OIFA a judgment to the effect that when OIFA acquired the property all County *ad valorem* real estate taxes assessed and owing against the property while privately owned were extinguished. OKLA. CONST. art. 10, § 6 does not mandate such an effect, but only applies to grant a tax exemption to State-owned property once it is acquired by the State. Further, 68 O.S.1991, § 2940 is unmistakably applicable to OIFA's acquisition of the real estate involved here. Section 2940 requires that *ad valorem* real estate taxes assessed while the property was previously in private ownership and such taxes which would have become due in the year of acquisition for that period of time the property remained in private ownership prior to OIFA's acquisition, must be paid in full. Section 2940 was intended to act as the substitute mechanism for the normal method of collection of *ad valorem* taxes contained in the Ad Valorem Tax Code (i.e. sale of the property) in the situation where the State, through one of its agencies acquires property for a governmental purpose upon which previously assessed taxes are unpaid or that would become due prior to the State's acquisition. In that such *ad valorem* taxes have not been paid as required by § 2940 in the situation presented here, County may sue OIFA in a civil action to collect them if they are not paid.

¶ 25 The Court of Civil Appeals' memorandum Opinion is VACATED, the trial court judgment is REVERSED AND THE MATTER IS REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

¶ 26 HODGES, LAVENDER, SIMMS, HARGRAVE and WATT, JJ., concur.

¶ 27 KAUGER, C.J., concurs in result.

¶ 28 OPALA and WILSON, JJ., concur in part; dissent in part.

¶ 29 SUMMERS, V.C.J., disqualified.

OPALA, Justice, with whom WILSON, Justice, joins, dissenting in part.

¶ 1 Today's opinion pronounces that the terms of 68 O.S.1991 § 2940 [1] introduce a mechanism for the collection of preassessed ad valorem taxes (and those that would become due for the year of the property's acquisition) by authorizing the acquiring public agency to (a) withhold these levies from the purchase price that is to be paid the seller and then (b) remit the withheld amount to the county. Because this procedure was not followed here and no money came to be withheld by the acquiring state agency (Okla-

9. OIFA's reliance on 68 O.S.1991, § 3142, a provision in the Ad Valorem Tax Code, to support its position in this matter is unavailing. Section 3142 provides:

> Whenever any lands shall be sold for delinquent taxes under the provisions of this article, upon which any mortgage or other lien exists in favor of the State of Oklahoma, or the Commissioners of the Land Office or any other commission, board or officer having power to loan public funds, or any funds under the control of the state upon real estate security, such tax shall be secondary at all times to the lien of the state, or the Commissioners of the Land Office, or of such commission, board or officer.

First, § 3142 does not apply here because there is no indication in this record the involved real estate was sold for delinquent taxes under the Ad Valorem Tax Code. Second, the primary purpose served by § 3142 is to insure that a State mortgage lien could not be foreclosed or divested in any county tax sale by making clear that an *ad valorem* tax lien is inferior or secondary to a State mortgage lien. *See Goode v. Montgomery,* 195 Okla. 63, 155 P.2d 228 (1945); *State ex rel. Commissioners of the Land Office v. Passmore,* note 7, *supra.* In other words, any purchaser at a tax sale upon which the State holds a mortgage lien would take subject to the mortgage lien of the State. Section 3142 simply does not control the issue of whether the Legislature, as it has done in 68 O.S.1991, § 2940, may mandate that delinquent *ad valorem* taxes must be paid when the State acquires real property for a governmental purpose.

1. For the text of 68 O.S.1991 § 2940 see *infra* note 6.

homa Industrial Finance Authority [OIFA or agency]), the court holds that under the provisions of § 2940 *individual liability* may now be imposed upon OIFA for the delinquent revenue due the county. The opinion declares that the county may recover this delinquency in a *personal action* against OIFA. Although I join in some aspects of today's disposition, I recede from the court's opinion.

¶ 2 *Firstly,* I dissent from the court's construction of 68 O.S.1991 § 2940. The critical issue to be settled here, which is *not* one of statutory construction, deals with the State's constitutional immunity from ad valorem levies that burden its newly-acquired land. *Secondly,* I strongly disagree that there can be found in § 2940 any modicum of textually demonstrable (or otherwise divinable) legislative intent to transmute the general *land-burdening concept of ad valorem levies* into the acquiring *public agency's individual liability* for their payment.[2] When an agency invokes the § 2940 procedures, an involuntary trust arises (by operation of law) in favor of the county (with the acquiring agency standing as the involuntary trustee and the county as a *cestui que trust*).[3] This record conclusively reveals that in the process of acquiring the land in suit the § 2940 mechanism was never set in motion. Without the actual existence of a § 2940 trust res, there can be no agency liability under that section.

¶ 3 *The dispositive question here is whether the county's lien survives the State's entry into the chain of title.* If it does, the land is burdened; if not, there is no tax lien.

The answer to be given calls for staking out the permissible reach of Art. 10, § 6, Okl. Const.[4]—the constitution-anchored provision that deals with state immunity for its land. Based on an analysis of that section's outer bounds, *my response to the critical question is in the affirmative—that the county's lien survives.*

¶ 4 OIFA, a *subordinate state-sponsored lending agency,* acquired its interest in the property in suit while *acting in a commercial capacity.* Its demand for a title that is completely freed of all ad valorem assessments *for the period before* OIFA came into the chain of title clearly lacks any support in Oklahoma's fundamental law. *Where the State's land is, as it was here, acquired in a nonsovereign capacity, its title comes burdened with all delinquent ad valorem taxes previously assessed against the premises (and those to become due up to the time of acquisition).*[5]

¶ 5 I would hence hold today that (a) the terms of § 2940 were neither invoked nor invocable by the acquiring public agency when title to land passed to OIFA; (b) the county's tax lien for the full amount of *preassessed ad valorem levies (and for afterassessed tax up to the time of the State's acquisition)* survived OIFA's entry into the chain of title; (c) the State's land is not freed from the burdening liability; and (d) because the lien survived the state acquisition of title, the remedies which the county may pursue for collection of delinquent ad valorem levies against private owners also are available against this public agency's land that came to the State in a nonsovereign capacity.

---

2. For the (ad valorem) tax liability of land, *see* cases cited *infra* note 8.

3. *See* discussion in Part I *infra.*

4. The pertinent text of Art. 10, § 6, Okl. Const. (1992), is:

   "(a) Except as otherwise provided in subsection (b) of this section, ... *all property of this state,* and of counties and of municipalities of this state ... shall be exempt from taxation...." (Emphasis supplied.)

5. This conclusion is drawn from consistent Oklahoma jurisprudence which, since statehood, has placed a restrictive construction on the § 6 (*supra* note 4) immunity for nonsovereign acquisition; but land passing to the State in its sovereign capacity is entirely freed from the lien of any ad valorem tax assessments validly made before its acquisition by the State. *State ex rel. Commissioners of Land Office v. Galyon,* 154 Okl. 204, 7 P.2d 484, 485 syl. 1 (1932); see also cases cited in *Galyon, supra; Foster v. City of Duluth,* 120 Minn. 484, 140 N.W. 129, 131 (1913); *State v. Locke,* 29 N.M. 148, 219 P. 790, 794 (1923).

## I

¶6 **THE PROVISIONS OF 68 O.S.1991 § 2940 DO NOT IMPOSE UPON THE ACQUIRING PUBLIC AGENCY *INDIVIDUAL LIABILITY* FOR THE AD VALOREM TAX DUE. IF ITS PROVISIONS ARE INVOKED AND THE MONEY NEEDED TO SATISFY THE AD VALOREM TAX IS INDEED WITHHELD, THE ACQUIRING PUBLIC AGENCY STANDS *VIS-A-VIS* THE COUNTY AS AN *INVOLUNTARY TRUSTEE* WHO IS LIABLE FOR THE AMOUNT OF *TRUST RES* SETTLED THROUGH COMPLIANCE WITH THE § 2940 PROCEDURES.**

¶7 The terms of 68 O.S.1991 § 2940 [6] prescribe a method for the acquiring public agency to withhold from the purchase price the amount that represents preassessed and delinquent ad valorem levies (as well as the proportionate share of the estimated tax for the current year). When the terms of § 2940 are invoked by the acquiring agency and money is withheld, an *involuntary trust* stands established by operation of law (with the acquiring agency standing as *trustee* and the county as *cestui que trust* ).[7] *On the other hand, if, as here, the record is crystal-clear that the acquiring public agency set no money aside from the purchase price to satisfy the delinquent ad valorem levies, no individual liability* may attach to the public owner for payment of the delinquency.

¶8 *Contrary to the court's conclusion, there is in § 2940 no textually demonstrable (or otherwise divinable) legislative intent to transmute the general land-burdening character of ad valorem levies[8] into an acquiring state agency's individual tax liability.* Because no agency liability is imposable by § 2940, the county must resort for collection to the very same procedures as those available

---

**6.** The terms of 68 O.S.1991 § 2940 are:

"*Whenever the* United States, the *state,* or a city, town, county, school district, or any other political subdivision, including, but not limited to, a turnpike authority, municipal trust, water or conservation district, flood control district, levee or waterway improvement district, urban renewal authority, public housing authority, or any other authority authorized by law, state or federal, *acquires title to any real property for a governmental purpose* between January 1 and October 1 of the tax year, such property shall be relieved of ad valorem tax for the remaining months of the year beginning with the first of the month next succeeding the date its acquisition for public purposes becomes a matter of public record, if the deed thereto was recorded prior to October 1; provided, however, that *all taxes assessed against such property prior to its acquisition shall be paid in full* and there be paid a sum equal to one-twelfth (⅟₁₂) times the number of months that the property remained in private ownership of an amount estimated by the county treasurer of the county wherein the real property lies to be substantially equal to the amount of tax which *would have been or will become due and payable for the year* had the real property not been acquired for public purposes. In estimating the amount of taxes which would have been or will become due and payable for the tax year had the real property not been acquired for public purposes the county treasurer shall use as a basis the current assessment and the tax rate for the preceding year, unless the tax for the current year shall be by then determined and set, in which event he shall use as basis the new assessment and rate. *The public agency acquiring the property shall deduct the amount of such taxes from the purchase price payable to* the private owner and remit the same to the county treasurer in satisfaction of such taxes. The county treasurer of any county is hereby authorized upon order of the board of tax roll corrections *to cancel of record all taxes assessed against such property for the year of its acquisition* when the deed thereto was recorded prior to October 1 and the aforesaid estimated amount of the tax for the months that the property was in private ownership is paid, which order shall be issued upon application of the acquiring authority." (Emphasis added.)

**7.** One who, though not a *consensual* trustee, stands nonetheless liable *qua* trustee for misapplied fiduciary funds is known in equity jurisprudence as involuntary or *de son tort* trustee. *Sandpiper North Apts., Ltd. v. American Nat'l Bank,* 1984 OK 13, 680 P.2d 983, 988. The terms—*de son tort, ex maleficio,* constructive, involuntary, implied-in-law trustee or one by operation of law—are all synonyms. *Id.* at 988 n. 10; *Davis v. National Bank of Tulsa,* 1960 OK 151, 353 P.2d 482, 488.

**8.** Ad valorem assessments are obligations *in rem* and not *in personam.* No personal liability is cast upon the property owner to pay the assessments levied against the land. *U.S. v. Home Fed. S. & L. of Tulsa,* 1966 OK 135, 418 P.2d 319, 325; *Allen v. Henshaw,* 197 Okl. 123, 168 P.2d 625, 629 (1946); *McDonald v. Duckworth,* 197 Okl. 576, 173 P.2d 436, 438 (1946) (the ad valorem tax code provides a comprehensive system by which delinquent taxes on real estate may be collected by the sale of the property). Although no personal liability for ad valorem taxes is chargeable against the owner, the unpaid levies

able against private landowners[9] to enforce its lien upon the OIFA land.[10]

¶ 9  In the context of this transaction the § 2940 procedure was neither used nor was it invocable.[11]  The *sale was effected* by extending a $35,000 credit upon judgments held by the bank and OIFA.[12]  Since the original acquisition was *jointly* made by a *private entity* acting with a *public agency*, the § 2940 procedures *were not at all available* to OIFA.  Neither did the § 2940 mechanism become available when the bank later transferred to OIFA its interest in the property, but paid no monetary consideration for the transfer of title.[13]  In sum, no § 2940 trust res was ever in existence.  *OIFA's land is burdened but the agency is free of individual liability* for this delinquency.

## II

### THE RULE PRESSED BY THE STATE TO FREE THE AGENCY'S LAND FROM LIABILITY FOR AD VALOREM TAX DUE AT THE TIME OF PURCHASE IS NOT INVOCABLE IN THIS CASE

### A.

¶ 10  *In The Transaction That Is The Subject Of This Litigation The Agency Was Not Acting For The State In A Sovereign Capacity*

¶ 11  Acting in a *sovereign capacity*, states create agencies to perform a wide range of functions at different levels.  The subordinate units of government are not themselves *sovereign bodies*.[14]  Rather, they serve as *instrumentalities of the state acting pursuant to delegated authority*.[15]

¶ 12  OIFA's stated purpose is to *"aid and assist with Oklahoma's industrial development* and provide additional employment and payrolls" (emphasis supplied) within the state.[16]  To accomplish this goal, the agency may issue and sell bonds, the proceeds of which are placed in an Industrial Development Loan Fund [Fund] that is to be kept in the state treasury.  Upon application of an industrial development agency,[17] OIFA is au-

---

constitute a continuing lien upon the realty. *Home Fed S. & L., supra* at 325.

**9.**  68 O.S.1991 § 3105; *Dearing v. State ex rel. Com'rs of Land Off.*, 1982 OK 5, 642 P.2d 226, 228–29 (when tax is overdue, unpaid ad valorem levies against realty attach as a lien against the entire fee and, unless redeemed, make the property subject to sale in satisfaction of the delinquency).

**10.**  OIFA may sue and *be sued* in all courts.  74 O.S.1991 § 855(h).

**11.**  The § 2940 procedure is ideally available in situations in which there is a cash purchase and money is due from the acquiring public agency to the owner.

**12.**  The property in contest was acquired at sheriff's sale on January 7, 1992 *by OIFA* (87.5%) and the *plaintiff (bank)* (12.5%) taking title *jointly* in their proportional undivided interests.

**13.**  OIFA acquired 100% fee ownership of the property in contest on August 9, 1995 when the plaintiff bank quitclaimed to OIFA its entire interest in the property.

**14.**  Sovereign power resides either in the federal government or in the several states.  *See Community Communications Co. v. City of Boulder,*

455 U.S. 40, 50, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982); *United States v. Kagama*, 118 U.S. 375, 379–81, 6 S.Ct. 1109, 1111–12, 30 L.Ed. 228 (1886).

**15.**  Government "bodies with limited legislative functions" are "derived from, or exist in, subordination to" state sovereign bodies.  *Kagama, supra* note 14, 118 U.S. at 379, 6 S.Ct. at 1111–12; *see also Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Com'n*, 403 So.2d 13, 20 (La.1981) ("the principle is well established that an administrative agency must act in conformity with its statutory authority, which it cannot exceed").  *See in this context* Shenefield, *The Parker v. Brown State Action Doctrine and the New Federalism of Antitrust*, 51 Antitrust L.J. 337, 341 (1982) ("[s]ubordinate [state] agencies operate under delegations of state sovereign power, and can only follow state policy").

**16.**  74 O.S.1991 § 852.

**17.**  An "industrial development agency" *is statutorily defined* as "any Oklahoma incorporated organization, foundation, association or agency, regardless of the particular name, whether organized for profit or nonprofit, which shall have as its primary function the promotion, encouragement and development of industrial, recreation-

thorized to lend money held in the Fund.[18] *When necessary to protect its loans, OIFA may take title through foreclosure to any industrial development project and then sell, transfer, convey or lease that project to any responsible entity.*[19]

¶ 13 Lending money for the expansion and growth of manufacturing and other industrial enterprises *is not a traditional governmental activity.* When the State creates a money-lending agency it acts in a commercial capacity. Because OIFA is an inferior agency established primarily to conduct and promote certain business activities, it cannot claim for itself the same status as that due the state when acting in its sovereign capacity.[20] When, as here, state ownership of land arises from activities *dehors* its sovereign role *the county cannot be forced to bear the*

**B.**

¶ 14 *In the Transaction That Is the Subject Matter of this Litigation the Agency Was Not Acting for the State as a Constitutional Fiduciary for Any State-owned Property.*

¶ 15 This case is *uniquely inapposite* for conferring upon the State the largesse it may expect under this court's school land commission jurisprudence. The State errs in relying on that precedent.[22] *The Commissioners of the Land Office is a constitutionally established managerial fiduciary for school lands.*[23] In that role the State acts in a *sovereign capacity.*[24] OIFA, on the other hand, is but a legislatively-created money lender.[25] In the exercise of the State's typi-

---

al, agricultural processing and manufacturing enterprises, livestock processing and conditioning enterprises and enterprises which process mined resources in Oklahoma." 74 O.S.1991 § 853(d).

**18.** 74 O.S.1991 § 855(g).

**19.** 74 O.S.1991 § 855(*o*).

**20.** A helpful analogy may be found in the rule of common law that, absent explicit legislation to the contrary, *exemption* from the impact of statutory limitations on personal actions stands confined to the state *qua* sovereign. *State ex rel. Schones v. Town of Canute,* 1993 OK 90, 858 P.2d 436, 440 (Opala, J., dissenting); *Okl. City Mun. Imp. Auth. v. H.T.B., Inc.,* 1988 OK 149, 769 P.2d 131, 137 (Opala, J., dissenting). *When acting in sovereign capacity no state agency is subject to statutory limitations unless it is expressly included by the terms of the pertinent enactment.* Time bars *do and will* govern the State when it is acting in a proprietary or commercial capacity. *See People v. Hale,* 320 Ill.App. 645, 52 N.E.2d 308, 310–311 (1943); *Great Western Ins. Co. v. Saunders,* 223 Iowa 926, 274 N.W. 28, 31–32 (1937); *City of Reidsville v. Burton,* 269 N.C. 206, 152 S.E.2d 147, 151–152 (1967); *Trustees of Bergen Community College v. J.P. Fyfe, Inc.,* 188 N.J.Super. 288, 457 A.2d 83, 86–88 (Law Div. 1982), *aff'd,* 192 N.J.Super. 433, 471 A.2d 38, 40 (App.Div.1983), *certification denied,* 96 N.J. 308, 475 A.2d 598 (1984).

**21.** *See* Part III(A) and (B), *infra.*

**22.** For the notion that upon a state agency's acquisition of title to land the county's tax lien must be extinguished, the State relies on *Galyon, supra* note 5 at 485 syl. 1 (*real estate acquired by*

the state in its sovereign capacity is absolved of further liability for ad valorem taxes); *State ex rel. Commissioners of Land Office v. Passmore,* 189 Okl. 232, 115 P.2d 120 (1941).

**23.** Art. 6, § 32, Okl. Const.; Art. 11, §§ 1, 2 and 5, Okl. Const. *See Oklahoma Ed. Ass'n, Inc. v. Nigh,* 1982 OK 22, 642 P.2d 230, 235–36; *State ex rel. Commissioners of Land Office v. Armstrong,* 199 Okl. 474, 188 P.2d 347, 349 (1947). The Commissioners of the Land Office is a constitutional body that has control of the sale, rental, disposal and management of school land and of other public lands of the state. *Nigh, supra* at 235–237; *Haskell v. Haydon,* 33 Okl. 518, 126 P. 232, 233 (1912).

**24.** *Nigh, supra* note 23 at 235–236 (the primary purpose of the school land trust is the protection of income for the support and maintenance of the common schools of the state); *Sears v. Fair,* 1964 OK 239, 397 P.2d 134, 138; *Goodin v. Commissioners of Land Office,* 174 Okl. 364, 50 P.2d 189, 191 (1935).

**25.** The pertinent terms of Art. 10, § 33A, Okl. Const., are:

"The Legislature of the State of Oklahoma is hereby authorized to enact legislation creating a State Industrial Finance Authority ... [which] shall be, and is hereby, authorized to issue and sell State Industrial Finance Bonds ... the proceeds [of which] ... to be loaned, and reloaned, by said Authority only to Oklahoma incorporated industrial development agencies (whether profit or non-profit) in Oklahoma communities, which agencies shall first have been approved and qualified by said Authority, such loans to be secured either by first

cally commercial activity, none of its agencies acts in a *sovereign* capacity.[26] While involved in a commercial capacity the State may neither lay claim to sovereign status nor interfere with a county's constitutionally authorized ad valorem revenue raising.[27]

¶ 16 In sum, the *State's* exercise of its *authority qua constitutional fiduciary for the school lands* bears no parallel to a state-sponsored money lending activity. As for the former role, the State acts and takes title to and holds land as a sovereign; in the latter capacity, it functions as commercial enterprise sponsor.

## III

¶ 17 JUDICIAL EXTINGUISHMENT OF AD VALOREM TAXES DUE OR TO BECOME DUE FOR A PERIOD ANTECEDENT TO STATE ACQUISITION OF LAND IN A NONSOVEREIGN CAPACITY WOULD OFFEND FUNDAMENTAL STATE LAW

### A

¶ 18 *The Terms Of Art. 10, § 9, Okl. Const.,[28] Prohibit The State From Receiving Benefits From Ad Valorem Tax Revenue*

¶ 19 The State seeks extinguishment of delinquent ad valorem levies against the OIFA-purchased land in order to invest its agency with clear title to the property in contravention of Art. 10, § 9, Okl. Const. The provisions of § 9 operate as an *absolute constitutional barrier* against appropriation of ad valorem revenue to benefit the State.[29] If the court were today to free the land in suit of *a validly assessed ad valorem tax,* it would enrich the nonsovereign state activity at the expense of the county. The result would clearly offend the § 9 mandate.

¶ 20 The judiciary is bound to give the words of the constitution that meaning which accords with *popularly accepted notions of their significance.*[30] The commonly understood meaning of the pertinent § 9 text[31] impels the conclusion that *judicial nullification* of an ad valorem levy, valid when assessed, which burdens state land acquired in

---

or second mortgage on the land, buildings and facilities of such industrial properties ..." Oklahoma Industrial Finance Authority was created by enabling legislation (74 O.S.1991 §§ 851 et seq.) defining it as "a body corporate and politic, constituting a public corporation and governmental instrumentality" of the state. 74 O.S.1991 § 854.

**26.** *State Insurance Fund v. Taron,* 1958 OK 282, 333 P.2d 508, 513 (when the government acts in a proprietary capacity, it does not enjoy sovereign status); *State v. Graham,* 12 Kan.App.2d 803, 758 P.2d 247, 251 (1988) (governmental functions are those which are performed for the "general public with respect to the general welfare"); *State ex rel. Schneider v. McAfee,* 2 Kan. App.2d 274, 578 P.2d 281, 283 (1978); *State ex rel. Stephan v. Brotherhood Bank and Trust Co.,* 8 Kan.App.2d 57, 649 P.2d 419, 422–23 (1982); *People ex rel. Nelson v. Waukegan State Bank,* 351 Ill. 158, 184 N.E. 237, 238 (1932) (while the state itself is sovereign, its agencies are *not* so universally).

**27.** Tax cancellation by judicial fiat would impermissibly invest an inferior agency—acting for the State in a purely commercial capacity—with a license to extinguish legitimate ad valorem revenue sources of a county.

**28.** The pertinent terms of Art. 10, § 9, Okl. Const., are:

"(a) * * * No ad valorem tax shall be levied for State purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this State be used for State purposes. * * *"

**29.** *Board of County Com'rs of Muskogee County v. City of Muskogee,* 1991 OK 115, 820 P.2d 797, 805.

**30.** Recognized constitutional hermeneutics dictates that fundamental-law provisions be interpreted in conformity with their ordinary significance in the English language, i.e., that they be given their commonly accepted nontechnical meaning. Fundamental-law provisions must be construed in a practical manner in order to honor the plainly manifested intent of their drafters. *In re Initiative Petition No. 363, State Question No. 672,* 1996 OK 122, 927 P.2d 558, 570; *Ogden v. Hunt,* 1955 OK 125, 286 P.2d 1088 syl. 1, 2; *Sharpe v. State ex rel. Oklahoma Bar Association,* 1968 OK 1, 448 P.2d 301, 306; *Wade v. Brown,* 1973 OK 137, 516 P.2d 526, 528; *Campbell v. White,* 1993 OK 89, 856 P.2d 255, 262.

**31.** For the pertinent text of Art. 10, § 9, Okl. Const., see *supra* note 28.

a nonsovereign status, violates the constitution's interdiction of that revenue source's use for the support of state activities.

### B.

¶ 21 *The Provisions of Art. 5, § 53, Okl. Const.,[32] Bar Public Officials From Releasing, Extinguishing Or Settling Obligations Due Any Of The There Enumerated Government Units*

¶ 22 The terms of Art. 5, § 53, Okl. Const., provide that the legislature shall have *no power* to release anyone's indebtedness *to* the State, *to* the county, or *to* its municipalities.[33] Section 53 targets any special act that would extinguish one's liability for a public debt.[34] Extinguishment of an obligation imposed by the county against land acquired by OIFA in furtherance of its commercial enterprise would plainly contravene the cited interdiction in the fundamental law. This

court's jurisprudence, no less than the legislature's enactments, must faithfully obey the *fundamental law's interdiction against official release* of public debts owed to the county and *against* the use of ad valorem revenue to benefit the State.[35] The judiciary is powerless to order county revenue's seizure and to confer its benefit upon a subordinate state-sponsored lending agency that acquired land in the course of its commercial activity.

### IV

¶ 23 A *FUNCTIONAL* APPROACH TO CREATING EXEMPTIONS FROM AD VALOREM TAX ASSESSMENTS

¶ 24 A governmental official's immunity from civil liability is now allocated on a "functional analysis".[36] In applying this approach

---

**32.** The terms of Art. 5, § 53, Okl. Const., are:

"Except as to tax and assessment charges against real property remaining delinquent and unpaid for a period of time as long or longer than that provided by law to authorize the taking title to real property by prescription, the Legislature shall have no power to release or extinguish, or to authorize the releasing or extinguishing, in whole or in part, the indebtedness, liabilities, or obligations of any corporation or individual, to this State, or any county or other municipal corporation thereof."

Delinquent taxes are "liabilities", and any law directly or indirectly releasing or extinguishing liabilities for taxes, in whole or part, is unconstitutional. *Thompson v. Smith*, 189 Okl. 217, 114 P.2d 922 (1941). A statute providing for *refunding of penalties accrued on ad valorem taxes was not violative* of this section. *City of McAlester v. Jones*, Okla., 181 Okl. 77, 72 P.2d 371 (1937). Laws 1915, Ch. 8, which extended the time for payment of certain taxes, did not remit or release penalties which had already accrued on delinquent taxes in violation of this section. *Rogers v. Mann*, Okla., 53 Okl. 648, 157 P. 331 (1916).

**33.** The provisions of Art. 5, § 53, Okl. Const., *supra* note 32, were intended to stamp out rampant and pernicious practice by some lawmakers of sponsoring *bills to exonerate* their political cronies of liability for a public debt. *See Covington Bridge v. Davidson*, 102 S.W. 339, 340 (Ky. 1907); *In re Stanford's Estate*, 126 Cal. 112, 58 P. 462, 464 (1899), identified in R.L. Williams, THE CONSTITUTION AND ENABLING ACT OF THE STATE OF OKLAHOMA ANNOTATED (1912), as a material source for the Constitutional Convention's text of Art. 5, § 53. *See also State ex rel. Schones v. Town of*

*Canute*, 1993 OK 90, 858 P.2d 436, 440 (Opala, J., dissenting).

**34.** Liability for taxes is treated as fixed only when their assessment has become final. *Love v. Silverthorn*, 187 Okl. 114, 101 P.2d 254, 257 (1940).

**35.** See, in the connection, Art. 5, § 46, Okl. Const., jurisprudence: *Reynolds v. Porter*, 1988 OK 88, 760 P.2d 816, 822. Although directed to the legislature, the terms of Art. 5, § 53, Okl. Const., *supra* note 32, and Art. 10, § 9, Okl. Const., *supra* note 28, are no less binding on the courts.

**36.** *See, e.g., Richardson v. McKnight*, —— U.S. ——, —— ——, 117 S.Ct. 2100, 2109–2110, 138 L.Ed.2d 540 (1997) (private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case); *Clinton v. Jones*, —— U.S. ——, ——, 117 S.Ct. 1636, 1644, 137 L.Ed.2d 945 (1997) (in a § 1983 action there is no absolute immunity for damages arising from "unofficial conduct"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (there is no absolute immunity for a prosecutor's conspiracy to manufacture false evidence that was later introduced at grand jury proceedings and at trial, or for a prosecutor's out-of-court statements to the press); *Burns v. Reed*, 500 U.S. 478, 484–486, 111 S.Ct. 1934, 1938–1939, 114 L.Ed.2d 547 (1991) (prosecutors have absolute immunity for their actions in participating in a probable-cause hearing but not in giving advice to the police); *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98

the court must look to the "nature of the functions" performed at the critical time, and not to the status of the defendant.[37] I *would adopt today a functional analysis* to determine for this case if the state was acting in a sovereign capacity when acquiring the land against which the unpaid ad valorem assessment is now sought to be canceled.[38] Measured by the gauge I propose, the State's quest for cancellation of the validly assessed tax cannot pass constitutional muster. Its land purchase bears no connection to any exercise of sovereign power. *In short, viewed through the prism of a functional analysis, the State's land in contest here was not acquired in sovereign capacity.*

## SUMMARY

¶ 25  Ad valorem assessments are a burden on the land as an *in rem* obligation rather than as the individual (*in personam*) liability of a landowner. When the procedures of 68 O.S.1991 § 2940 are invoked by the acquiring public agency (*and money is withheld from the purchase price to be*

*paid*), an involuntary trust relationship stands created. In the absence of an involuntary trust, there is nothing in § 2940 to show legislative intent for transmuting the *land's delinquent burdens* into the acquiring *agency's individual liability.* For payment of ad valorem levies no liability may be imposed on the acquiring public agency *dehors* the parameters of a § 2940 involuntary trust. Because the county's ad valorem lien survived OIFA's entry into the chain of title, *the land itself cannot be freed of its ad valorem delinquency.* The lien of that levy is enforceable against OIFA—*qua* public titleholder—by the same remedies as those available against private landowners.

¶ 26  Because the State did not take title as a sovereign but rather acquired it in a commercial capacity, the interdictions in Art. 10, § 9, Okl. Const.[39] and in Art. 5, § 53, Okl. Const.[40] would stand *offended* by a judicial decree (a) freeing the land acquired by a state-sponsored public money lender from a lien that secures delinquent ad valorem levies and (b) conferring a benefit on the State by

L.Ed.2d 555 (1988) (a judge is not entitled to absolute immunity for the "administrative" act of dismissing an employee); *Malley v. Briggs,* 475 U.S. 335, 342–343, 106 S.Ct. 1092, 1096–1097, 89 L.Ed.2d 271 (1986) (a police officer is not entitled to absolute immunity for false statements made in a warrant application); *Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985) (there is no absolute immunity for prison disciplinary board members who adjudicate free from various procedural safeguards, including, the right to counsel, cross-examination, a transcript, and direct judicial review); *Briscoe v. LaHue,* 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983) (all witnesses, including those who give perjured testimony, are absolutely immune from civil suit under § 1983); *Harlow v. Fitzgerald,* 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982) (government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known); *Butz v. Economou,* 438 U.S. 478, 511–513, 98 S.Ct. 2894, 2913–2914, 57 L.Ed.2d 895 (1978) (federal officials are not liable for mere mistakes in judgment, whether the mistake is one of fact or one of law); *Imbler v. Pachtman,* 424 U.S. 409, 420–425, 96 S.Ct. 984, 990–993, 47 L.Ed.2d 128 (1976) (state prosecutors have absolute immunity for the initiation and pursuit of a criminal prosecution, including presentation of the state's case at trial).

37. *Briscoe, supra* note 36, 460 U.S. at 342, 103 S.Ct. at 1119; *Forrester, supra* note 36, 484 U.S. at 229, 108 S.Ct. at 545 ("it [is] *the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis*") (emphasis added); *Cleavinger, supra* note 36, 474 U.S. at 201, 106 S.Ct. at 496 ( [a]bsolute immunity "flows not from rank or title or 'location within the Government;' ... but from the nature of the responsibilities of the individual official"), quoting *Butz, supra* note 36, 438 U.S. at 511, 98 S.Ct. at 2913.

38. Functional approach is thus far limited to governmental employees carrying out the various functions for their employer. The analysis has not yet been extended to private individuals who undertake for profit government tasks to be performed under a contract. *See, e.g., Richardson, supra* note 36, —— U.S. at ——, 117 S.Ct. at 2107–08 (the Court refused to extend the functional-analysis approach to employees of a private enterprise performing governmental functions).

39. For the pertinent terms of Art. 10, § 9, Okl. Const., see *supra* note 28.

40. For the pertinent terms of Art. 5, § 53, Okl. Const., see *supra* note 23.

canceling the county's legitimate claim to an ad valorem revenue source.

¶ 27  The *State's interest* in the land initially acquired jointly with a private entity (through its nonsovereign money-lending agency) is *inferior* and subject to the *county's lien claim* for all *preassessed ad valorem* levies *(and for afterassessed portion up to the time of the State's acquisition).*  The county's lien *survives* the State's entry into the chain of title.  OIFA's demand that its title to the land in suit be recognized as an asset acquired in the State's sovereign capacity must fail.  The nisi prius court should on remand *declare the delinquent ad valorem levies* validly impressed as a lien but it should pronounce the State's land free from that burden which may be due for the period beginning ·with OIFA's entry into the chain of title as the property's *sole owner.*[41]

---

**41.**  Once the property had passed to the State *in any capacity*, the county's power *further to burden it* with ad valorem levies came to an end by force of Art. 10, § 6, Okl. Const., *supra* note 4; *Galyon, supra* note 5 at 485.